Scott, J.
This action is brought against the treasurer of Champaign county for proceeding under the act of March 14, 1853, to-collect from the plaintiff a tax which is said to have been improperly and wrongfully assessed.
In determining upon the sufficiency of the petition it becomes-necessary to inquire into the alleged irregularities in the assessment of the tax.
The -petition shows that the tax now in controversy was not charged on the duplicate, as originally made out by the auditor of the county and delivered to the treasurer for collection ; but was, by the auditor, subsequently placed on the duplicate whilst in the-hands of the treasurer, and after the taxes which had been assessed upon the property returned by the bank for taxation, for the same-year, had been fully paid. By this additional entrjq which was-made upon the duplicate about the 20th of November, 1852, the plaintiff was charged with a tax upon $22,000 of stocks or bonds of this state, which the auditor claimed to have then ascertained, for the first time, were owned by the bank and subject to taxation, and which were not included in the written statement of taxable-property and effects returned by the bank to the auditor. The *43 first question then is, had the auditor power to correct the statement returned to him by the proper bank officers, under oath, after having received and so far acted upon it ?
The 19th and 20th sections of the tax law of 1852, made it the duty of the president and cashier of the bank to make out and return, under oath, a statement of its taxable resources, which are fully specified in the same actions ; and in case of their neglect or refusal to furnish such statement, the 41st section of the same law gave the auditor full power, and made it his duty, to ascertain the-amount with which the bank should be taxed, upon the basis provided by the 19th and 20th sections, to add ^thereto fifty per cent., and enter the aggregate sum'on the duplicate for taxation.
But in this case a statement had, in fact, been returned ; the auditor, relying upon the oath of the proper parties, and supposing it to be accurate, had accepted and treatod it as such. The bank had been taxed accordingly, and the tax had been paid. It was, clearly, too late to proceed under the 4'lst section, as though no-statement had been made.
But if, whilst the duplicate was still in the hands of the treasurer, and in a course of collection, the return made by the bank officers was found to be false or imperfect, does the law furnish no-means of correcting it ?
The 46th section of the same act provides as follows: “ The-county auditor, if he shall have reason to believe or be informed, that any person has given to the assessor a false statement of the-personal property, moneys, or credits, investments in bonds, stocks, joint stock companies, or otherwise, or that the assessor has not returned the full amount required to be listed in his township, or has-omitted or made an erroneous return of any property, moneys, or credits, investments in bonds, stocks, joint stock companies, or otherwise, which are by law subject to taxation, shall proceed, at any time before the final settlement with the county treasurer, to-correct the return of the assessor, and to charge such person on the duplicate with the proper amount of taxes; to enable him to do which, he shall be invested with all the powers conferred on township assessors by this act; and it shall be the duty of the auditor, in all such cases, to notify every such person before making the entry upon the duplicate, that he may have an opportunity of showing that his statement, or return of the assessor, was correct,” etc.
*44 By this section all statements of property liable to taxation, made under oath to the assessor, are subject to correction ; but its provisions are not expressly made applicable to statements returned by banks directly to the auditor.
But in giving a construction to this section, we may well look to the spirit and intention of the whole act; which clearly is, to subject all projDerty in the state to taxation, and to let none escape *from its proper share of the burden. This appears from its title. To effect this purpose, every person owning property, not specially exempted, is required to make out, and verify by affidavit, a full statement of the same. These statements are returnable generally to the assessor. In framing the 46th section, this circumstance may well be supposed to have been in the mind of the draughtsman, and hence the statements are referred to as being made to the assessor. But the intention of the whole section, the purpose of its insertion, clearly is, to declare that the oath of an interested party shall not be conclusive of the correctness of the statement; but that fraud or mistake therein shall, if discovered in proper time by the auditor, be corrected. No reason can be imagined why the conclusive verity of a written statement should be made to depend upon the person or officer to whom it is delivered. We are satisfied, therefore, that we give effect to the legislative intent, when we hold that this section includes statements made to the auditor, under the 19th section of the act; and that such statements, if false or defective, may be corrected accordingly
But, it is said, this state stock was put upon the duplicate, and subjected to taxation, without notice to the bank; that such assessment is therefore invalid, and can furnish no defense to the treasurer in this action.
This question is not free from difficulty. We can not regard the provision of the statute requiring notice, as directory merely. It is not matter of form only, but of substance. Where a statement of property subject to taxation has been made out, and verified by the oath of the party, returned to the proper officer, and by him accepted as such, and the amount therein stated is entared upon the duplicate for taxatidn, it can not be that the legislaure intended to put it in the power of the auditor to increase this amount without notice to the party interested. We apprehend the provisions of the statute, as to the issuing and service of a summons, to bring a defendant into court, in a civil action, are not *45 simply directory; and that a substantial compliance with them, is essential to the validity of the subsequent judgment.
*But the assessment of a tax affects, as vitally, the rights and interests of the party assessed, as the rendition of a judgment against him.
Indeed, the collection of the former is much more summary in its mode, under the law of 1853, than the ordinary process of execution upon the latter. The language of the statute is : “ It shall be the duty of the auditor, in all such cases, to notify every such person, before making the entry upon the duplicate, that he may have an opportunity of showing that his statement, or return of the assessor, was correct.” Until this notice be given, the auditor has no jurisdiction of the party, and can therefore make no valid assessment against him, however perfect and full may be his jurisdiction of the subject-matter.
The party interested has a clear right to a hearing, and a daypn court, as well by the express terms of the statute, as by the plainest principles of justice.
What then is the effect of this nullity of the assessment upon the liability of the treasurer in the present action ? If we regard it as an equitable action, brought to recover, as for money had and received by the defendant for the use of the plaintiff, a recovery must be had, if at all, upon equitable principles. The plaintiff must show a case in which, ex osquo et bono,'the amount of the tax should be repaid to him; and the question would then arise: Were these state stocks properly taxable ? Were they property which, by law, should have been returned, by the plaintiff, to the county auditor for assessment ? The equities of the plaintiff depend upon the answers to these questions.
But if we place the petition in this case on the footing of a declaration in trespass, under the former practice (which we suppose, from its form, to have been the intention of the pleader), the right of recovery must be determined by the rules applicable to such action.
The authorities are not uniform, as to the circumstances under which a ministerial officer can justify, in trespass, by showing that the alleged tortious acts were done.by virtue of process. In Savacool v. Boughton (5 Wend. 170), upon a full review of the authorities, Judge Marcy lavs down the following propositons, as sustained by reason and authority: “ If a mere ministerial *46 •officer executes any process, upon the face of which it appears that the court which issued it had not jurisdiction of the subject-matter, or of the person against whom it is directed, such process will afford him no protection for acts done under it. But if the subject-matter of a suit is within the jurisdiction of a court, but there is want of jurisdiction as to the person or place, the officer who executes process issued in such suit is no trespasser, unless the want of jurisdiction appears by such process.” We regard this ,as the true rule, and as applicable by analogy to the case before us. The duties of a county treasurer, in the collection of taxes, are ministerial; his duplicate is the process, for the execution of which, by the prompt collection of the taxes assessed thereon, the law holds him responsible.
Thus situated, and with the severe penalties of the law of 1853 ■suspended over his head, he is at least entitled, in an action of trespass, to the full benefit of the rule we have quoted. How, then, stands the case?
It is averred in the petition that the tax, in the collection of which the alleged acts of trespass were committed by the defend.ants, was placed upon the duplicate by the county auditor after the 20th day of November, 1852, and whilst the duplicate was in defendant’s hands, and that defendant was informed by said auditor ,at the time, that the property upon which said tax was assessed ■“ was stocks of the State of Ohio, and that said stocks and tax were •by him so placed on said duplicate upon the sole authority of a ■letter from the auditor of state, and upon no other evidence;” and it is further averred that the defendant then read said letter, a copy •of which is appended.
But it is not alleged that the defendant had knowledge that no ■previous notice had been given to the bank, or that its officers had not been afforded a full opportunity of showing that the statement .given by them to the auditor was correct. We do Dot supj>ose it to have been within- the province of the treasurer to determine upon the sufficiency of the evidence upon which the auditor acted. But were it so, an official statement of the state *auditor, as to facts evidenced by the files and records of his office, would be, at least, prima facie evidence of such facts, and in the absence of any proof to the contrary might well warrant the county auditor in •correcting the duplicate accordingly.
This correction might.well be made after the 20th of November, *47 ¡the statute permitting it to he done “ at any time before final settlement with the county treasurer.” The duplicate then not showing upon its face the want of jurisdiction of the person, and there being no averment in the petition that such want of jurisdiction was otherwise known to the treasurer, he must be protected, if the •county auditor had jurisdiction of the subject-matter. This was a tax upon stocks, or bonds of this state, and this fact was known to the defendant. If such bonds were not subject to taxation, the ■auditor had no jurisdiction of the subject-matter; and his assessment of them on the duplicate furnishes no defense to the treasurer. We are thus brought to the main question: Were these state bonds subject to taxation?
The petition does not state under what law or laws these bonds were issued; and even if it were averred that they were issued under a law which expressly exempted them from taxation, yet there is nothing in the case to charge the treasurer with knowledge of that fact. Neither is it claimed that the bonds are by their own terms exempted from taxation. But there is enough in the petition to show that they were issued .before the adoption of our present state constitution, if that fact be important.
Assuming, then, that there is nothing'in the terms of the bonds, nor in the laws under which they were issued, expressly exempting them from or subjecting them to taxation, was it competent for the state legislature to make them the subject of taxation?
Our present state constitution, art. 12, provides: Sec. 2. “Laws shall be passed taxing, by a uniform rule, all moneys, credits, investments in bonds, stock, joint stock companies, or otherwise,” etc. See. 3. “The general assembly shall provide by law for taxing the notes and bills discounted or purchased, money loaned, and all ether property, effects, and dues of every description (without deduction), of all banks now existing, or hereafter created,” etc. Under these requirements of the constitution, *the general tax law of 1852 was passed, which, in the nineteenth section, makes it the duty of all banks of circulation in the state, annually to return to the auditor of their county for taxation: “ 1. The average amount of notes and bills discounted,” etc. “ 2. The average amount of all other moneys, effects, or dues, of every description, belonging to such bank or banking company, loaned, invested, or otherwise used or employed, with a view to profit, or upon which *48 such bank or banking company receives, or is entitled to receive,, interest.”
The language of these constitutional and legislative provisions is so explicit and comprehensive, as to exclude all doubt of the intention to subject the stocks in question to taxation. In other words, if the subject-matter be within the taxing power of the state, that, power has been exorcised.
It is not claimed that any special provision of the state constitution, in force when these bonds were issued, and which is not embodied in the present constitution, created the exemption now demanded ; nor that such exemption arises from the terms of the-act of 1851, to “authorize free banking,” under which the plaintiff' was organized.
But it is claimed, that this is a tax tlpon a contract, and impairs-its obligations; that its effect is to lessen the amount of interest which the holdex*s of the bonds are entitled, by the terms of their-contract,'to demand of the state.
How far is the question here presented affected by the' fact, that, the state is a party to the contract, evidenced by the bonds ?
In the imposition of taxes, as in all legislation, a state exercises-an attribute of sovereignty. But the ’ making of a contract does-not necessarily bring into exercise any such attribute. Private, individuals are generally competent to make contracts.
Admitting, as we do, that a state may, by the express terms of her contract, limit to some extent the future exercise of her sovereignty ; and that she may, from considerations of policy, or interest, bind herself not to exercise the taxing power over a specified subject-matter; or to exercise this power only in a specified mode, and that the power so to biixd herself results from, and caxx only be exercised in virtue of, her sovereignty; yet it is very *clear that the simple contract of borrowing money has no relation to-her sovereign chax’acter or power, and leaves them wholly unimpaired. By such a contract, it is true, a state and an individual are equally bound. The State of Ohio can not, by virtue of berso vereignty, cancel or modify a contract to which she is a party; not because it is her contract, but because it is a contract. The lawful coixtracts of her humblest citizens are equally sacred. Shecaxx not constitutionally impair the obligations of either.
One man invests capital in state stocks, as a source of .income and profit to himself. From the same motives of interest, othex *49 capital, is invested in the bonds of a private corporation, or the-notes of individuals. These investments are equally taxed, as-property; as sources of profit and income. The consequence is, that the profit is diminished in both cases. This is an effect, but not the object of the law imposing the taxation. It contemplates no such purpose. As between the parties, the contract is left in full force ;■ but the property invested, or acquired by the contract, is taxed, not by way of interference with the rights of the parties, as borrower and lender, but for the support of government, and the consequent, protection and welfare of the whole community.
No one doubts the power of the state to tax land within its territorial limits, whether held by direct grant from the state, or by title from a different quarter. And if the taxation of capital invested in State bonds, impairs the obligation of a contract which contains no stipulation for exemption, upon what principle shall the taxation of bank-bills, or corporation bonds, or the notes of individuals, be justified?
The principle that, in the absence of any stipulation to the contrary, a sovereign state possesses the power óf taxing all property held under it, and within its jurisdiction, is fundamental, and essential to the very being of government. Property can only be-acquired and held subject to this condition ; and this infirmity of tenure, if it be one, furnishes the only adequate means for its protection.
¥e readily concede, that the state can not affect the obligations of a contract to which she is a party, further or otherwise than *in the case of a contract between other parties. But the claim here is, that the state shall confer a bonus on her bondholders. For an exemption of moneys invested in her bonds from the burden of taxation, common to ,all other property within the state, would be a substantial and valuable bonus. In the absence of any such express stipulation in the contract, I do not perceive-an equitable foundation upon which to rest a claim to an exclusive-privilege, so directly interfering with the sovereign power of the state.
We would be wholly unwilling to sanction the least breach of good faith on the part of the state. It is her duty, as well as her interest, to set an example of honesty and fair-dealing in all her transactions. But it is proper to say, that the circumstances preceding and attending the issuing of these bonds, were not such as *50 bo warrant the inference or belief, on the part of those who became their purchasers, that they were to be exempted from taxation. •Other bonds had been previously issued by the state, under laws ■expressly exempting them from taxation. It was then thought necessary, in order to create such exemption, that it should be made matter of express stipulation; and that her power of taxation •could not be limited or modified without her express consent. The ■bonds now in question, were subsequently issued, under other laws, providing for no such exemption.
The inference is fair, that it was not intended. Ho purchaser bad a right to assume, that she did not intend to retain the power, with which she did not, as before, expressly part.
The question we have been examining, is ¡^resented in several ether cases now before us, and in the argument of those eases reference is made to the case of Weston v. The City Council of Charleston, 2 Pet. 449.
In that case, a majority of the judges of the Supreme Court of the United States held that a tax imposed by a law of any state of the Union, or under the authority of such a law, on stocks issued for loans made to the general government, is unconstitutional. That decision throws but little light on the question now before us. The determination of that question was controlled by considera» tions growing out of the supremacy of the ^general government, within its constitutional sphere, and the subordinate relations which the several states sustain to it within that sphere.
Rut we have been referred to no authority, nor am I aware of any, which denies to a state the power of taxing capital invested by its ■citizens in its own bonds. On the contrary, the unqualified general power of taxation, which includes this particular one, would ■seem to be everywhere recognized.
In Prov. Bank v. Billings, (4 Pet. 514), Chief Justice Marshall isays: “ The power of legislation, and consequently of taxation, rests and operates on all the persons and property belonging to the body poolitic. This is an original principle which lies at the foundation of society itself. It is granted by all for the benefit of all. It resides in the government as a part of itself, and need not be reserved, when property of any description, or the right to use it in .any manner, is granted to individuals or corporate bodies. Again, It is said, in the same case, speaking of the taxing power : “ As the whole community is interested in retaining it undiminished, that *51 community has a right to insist that its abandonment ought not to be presumed, in a ease in which the deliberate purpose of the state to abandon it does not appear.”
To the same effect is the language of the court in McCulloch v. Maryland, 4 Wheat. 428, and in Nathan v. Louisiana, 8 How. 82.
In Phil. & Wil. R. R. Co. v. Maryland, 10 Bow. 393, Chief Justice Taney says, in delivering the opinion of the court: “ This coui’t on several occasions has held that the taxing power of a state is never presumed to be relinquished unless the intention to relinquish is declared in clear and unambigious terms.”
The position that the tax in question does not violate the contract of the state to pay interest at a given rate upon the bonds, and the views we have expressed on that subject, are strengthened by the case of Commissioners etc. v. Chapman, 2 Rawle, 77, where it was held by the Supreme Court of Pennsylvania, that a tax imposed under the authority of the legislature, upon a judge’s salary, was not in violation of a provision, in the state constitution which prohibited the diminishing of such salary during the term of office. The court, per Gibson, C. J., says : “ The*prohibitionin question is tobe restrained to laws which have a reduction of the salary for their object, and not for their consequence. • • • • For the bona ■fide purpose of contribution, a reasonable portion of the salary, like any other part of his property, may be applied to the public exigencies.”
Without further reference to authorities, which we think are nearly, if not quite, uniform on the subject, we hold that the taxation of the bonds in question involves no violation of a contract, and that the power of the state to tax them, equally with other property, having never been expressly surrendered, still exists in full force.
The objection made by the petition to the constitutionality of the tax law of 1852, in respect to the basis which it provides for the taxation of banks, is fully met by the decision of this court in Exchange Bank of Columbus v. Hines, 3 Ohio St. 1.
Nor does it affect the defendant’s justification, that at the time he took the summary measures complained of, another proceeding instituted by him for the collection of the same taxes, under the fifty-first section of the tax law, was pending in the court of common pleas, and that the bank had filed its answer therein. For the law of 1853 took from the defendant the power of proceeding *52 farther under the said fifty-first section, and substituted for that; process a much more summary one, which it imperatively required him to adopt. If this law was valid, obedience to it became his. duty.
Demurrer sustained, and cause remanded.
Bartley, C. J., and Swan and Brinkerhoee, JJ., concurred.